**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | |
|---|---|
| DORA OATMAN, | Case No. 12-cv-02770 |
| Plaintiff, | Judge James S. Gwin |
| vs. | Magistrate Judge Greg White |
| INFOCISION, INC., et al., | |
| Defendants. | |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS**
**CERTIFICATION**

# TABLE OF CONTENTS

**Page**

LIST OF EXHIBITS ...........................................................................................................ii

TABLE OF AUTHORITIES ...............................................................................................iv

INTRODUCTION ................................................................................................................1

STATEMENT OF FACTS ...................................................................................................2

    A. Oatman Never Discussed Donation Allocation With An InfoCision Employee.. ..................2

    B. InfoCision's Representations to Donors and Volunteers Are Not Uniform. .........................4

    C. Oatman Cannot Identify Class Members From InfoCision's Records. ..................................4

    D. Oatman Did Not Donate to the Named Charities During the Class Period. ...........................5

LEGAL STANDARD ..........................................................................................................5

ARGUMENT .......................................................................................................................6

I.   OATMAN'S ORIGINAL PROPOSED CLASS CANNOT BE CERTIFIED. ...........................6

    A. Identifying The Members Of Her Putative Class Is Impossible. ..........................................6

        1. Without mini-trials, it is impossible to distinguish people who received a representation about donation allocation from people who did not. ..................6

        2. Even if one could determine which call recipients received a donation-allocation representation, the class's membership would still be unascertainable. ..........................7

    B. Individual Issues Predominate over Common Issues, and A Class Proceeding Is Not The Superior Method of Litigation. ...............................................................................10

        1. Individual issues of law predominate. ...................................................................10

        2. Individual fact issues regarding misrepresentations predominate. ....................................10

        3. Individual fact questions regarding the class members' reliance predominate. ...............12

        4. Individualized issues regarding the fact and amount of damage predominate for people who agreed to volunteer. ....................................................14

    C. Oatman Is Not Typical of The Class She Seeks To Represent. ..........................................15

II.  OATMAN'S AMENDED CLASS DEFINITION ONLY MAKES MATTERS WORSE. ........16

    A. Oatman Offers No Evidence Supporting Certification of the Amended Class. ....................16

    B. Oatman's Nebulous Amended Class Definition Is Uncertifiable, Under Either of Its Possible Constructions. ..................................................................................17

    C. Oatman is Not Typical of the Class She Seeks to Represent. .............................................18

    D. Commonality is Lacking, and Individual Issues of Law and Fact Predominate. ...................19

CONCLUSION ..................................................................................................................20

## <u>LIST OF EXHIBITS</u>

1.    Excerpted Transcript of June 26, 2013 Deposition of Dora Oatman

2.    Declaration of Stephen Brubaker

3.    Declaration of Michael White

4.    Oatman's Responses to InfoCision's First Set of Interrogatories

5.    Oatman's April 2012 U.S. Bank Statement

6.    Cancer Support webpage

7.    Wilcox Declaration on behalf of American Cancer Society

8.    ADA Declaration

9.    AHA Declaration

10.   Expert Report of Dr. Joseph Sedransk

11.   Declaration of Michael Dominic Meuti

12.   Transcript and Audio of Call #3508

13.   Transcript and Audio of Call #4065

14.   Transcript and Audio of Call #3745

15.   Transcript and Audio of Call #6205

16.   Transcript and Audio of Call #6854

17.   Transcript and Audio of Call #370

18.   Transcript and Audio of Call #481

19.   Transcript and Audio of Call #6895

20.   Transcript and Audio of Call #10303

21.   Transcript and Audio of Call #5613

22.   Transcript and Audio of Call #5659

23.   Transcript and Audio of Call #2492

24.   Excerpted AHA July 2010 Q1 Script (Bates Stamped IMC_00003193)

25.  Excerpted AHA July 2012 Q1 Script (Bates Stamped IMC_00001622)

26.  Excerpted ADA January 2010 Research Partners Renewal Program Script (Bates Stamped IMC_00001310)

27.  Declaration of Broock Munro

28.  Declaration of Franklin DeJulius

29.  Excerpted AHA July 2008 Quarterly Program (Bates Stamped IMC_00002863)

30.  Excerpted AHA FY 2009 National (Bates Stamped IMC_00002991)

31.  Excerpted ACS National FY 2010 (Bates Stamped IMC_00003245)

32.  Excerpted ADA 2009 Residential (Bates Stamped IMC_00004814–IMC_00004815)

33.  Excerpted ADA 2009 Cure Campaign (Bates Stamped IMC_00004827)

34.  Excerpted ADA 2011 Friends and Family (Bates Stamped IMC_00004995)

35.  Excerpted ADA 2011 Residential (Bates Stamped IMC_00005013)

36.  July 3, 2013 Letter From Michael D. Meuti to Margaret Murray

37.  Spreadsheet of Sample A (Nationwide All Charity) Excluding Inbound Calls

38.  Spreadsheet of Sample A (Nationwide All Charity) Including Inbound Calls

39.  Spreadsheet of Sample B (Nationwide Named Charity) Excluding Inbound Calls

40.  Spreadsheet of Sample B (Nationwide Named Charity) Including Inbound Calls

41.  Spreadsheet of Sample C (Ohio All Charity) Excluding Inbound Calls

42.  Spreadsheet of Sample C (Ohio All Charity) Including Inbound Calls

43.  Spreadsheet of Sample D (Ohio Named Charity) Excluding Inbound Calls

44.  Spreadsheet of Sample D (Ohio Named Charity) Including Inbound Calls

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**CASES**

*In re Am. Med. Sys., Inc.*,
    75 F.3d 1069 (6th Cir. 1996)...................................................................................... 5

*Anderson v. United Fin. Sys. Corp.*,
    281 F.R.D. 292 (N.D. Ohio 2012)........................................................................... 7, 18

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ................................................................................................... 5

*Comcast Corp. v. Behrend*,
    133 S. Ct. 1426 (2013) ..................................................................................... 5, 16, 20

*Faktor v. Lifestyle Lift*,
    2010 WL 271346 (N.D. Ohio Jan. 15, 2010).................................... 12, 13, 14, 19, 20

*Freid v. Nat'l Action Fin. Serv., Inc.*,
    2011 WL 1547257 (D.N.J. Apr. 20, 2011) ............................................................. 12

*Gen. Tel. Co. of the SW v. Falcon*,
    457 U.S. 147 (1982) ................................................................................................... 5

*Genenbacher v. CenturyTel Fiber Co. II*,
    244 F.R.D. 485 (C.D. Ill. 2007) ............................................................................. 17

*Givens v. Van Devere, Inc.*,
    2012 WL 4092738 (N.D. Ohio Sept. 12, 2012) ....................................................... 7

*Godec v. Bayer Corp.*,
    2011 WL 5513202 (N.D. Ohio Nov. 11, 2011) ...................................................... 19

*Hale v. Enerco Group, Inc.*,
    288 F.R.D. 139 (N.D. Ohio 2012).......................................................................... 13

*Marcus v. BMW of N. Am., LLC*,
    687 F.3d 583 (3d Cir. 2012)..................................................................................... 10

*McLaughlin v. Am. Tobacco Co.*,
    522 F.3d 215 (2d Cir. 2008)................................................................................. 5, 13

*Moore v. PaineWebber, Inc.*,
    306 F.3d 1247 (2d Cir. 2002).............................................................................. 11, 12

*Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*,
    259 F.3d 154 (3d Cir. 2001)..................................................................................... 15

*Pastor v. State Farm Mut. Auto. Ins. Co.*,
  487 F.3d 1042 (7th Cir. 2007) ........................................................... 10

*Pfaff v. Whole Foods Mkt. Group Inc.*,
  2010 WL 3834240 (N.D. Ohio Sept. 29, 2010) ..................................... 6

*Phillips Petroleum v. Shutts*,
  472 U.S. 797 (1985) ........................................................................... 10

*Pilgrim v. Universal Health Card*,
  660 F.3d 943 (6th Cir. 2011) .............................................................. 10

*Randleman v. Fidelity Nat'l Title Ins. Co.*,
  646 F.3d 347 (6th Cir. 2011) .............................................................. 17

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*,
  487 U.S. 781 (1988) ........................................................................... 19

*Sprague v. Gen. Motors Corp.*,
  133 F.3d 388 (6th Cir. 1998) ........................................................ 13, 15

*Stout v. J.D. Byrider*,
  228 F.3d 709 (6th Cir. 2000) .............................................................. 19

*Thorogood v. Sears, Roebuck & Co.*,
  547 F.3d 742 (7th Cir. 2008) .............................................................. 13

*Wal-Mart, Inc. v. Dukes*,
  131 S. Ct. 2541 (2011) .................................................................*passim*

**RULES**

Rule 23 ...........................................................................................*passim*

**INTRODUCTION**

Under either of Plaintiff Dora Oatman's class definitions, certification is not appropriate. Her initial class complaint sought to certify a national class of charitable donors and volunteers based upon two central allegations:  (1) that InfoCision "uniformly misrepresents" to them how much of their money goes to charity and how much goes to InfoCision (referred to as the "donation allocation" representation), and (2) that in reliance upon these misrepresentations, Oatman donated to the American Heart Association ("AHA"), the American Diabetes Association ("ADA"), and the American Cancer Society ("ACS") (collectively, the "Named Charities") during the class period (i.e., since September 27, 2008).

This class, which Oatman still pursues, cannot be certified.  Oatman cannot identify the class members, commonality is lacking, and individualized issues of law and fact abound.  Also, Oatman is not even a member of that class because, among other reasons, the representations about which she complains occurred more than 20 years ago—before InfoCision worked for the Named Charities.  More fundamentally, she offers no evidence sufficient to meet her burden of demonstrating that certification is appropriate.  Oatman has not even shown that she donated to one of the Named Charities during the class period, and the evidence shows that she has not.

In the face of these insurmountable obstacles, Oatman's counsel throw a Hail Mary pass, proposing an amended class definition based on not only donation-allocation misrepresentations, but also a veritable kitchen sink of additional misrepresentations.  Oatman now seeks to represent everyone who, during the class period, donated or volunteered to one of 40 or more charities after speaking with an InfoCision communicator who "directly or impliedly misrepresented" some unspecified facts that were "material to the prospective donation of time or money, in violation of applicable law."  This fail-safe class definition is so vague as to be meaningless.  And it creates even more certification problems than the original class definition, solving nothing in the process.

For the reasons set forth below, certifying either proposed class is inappropriate.[1]  The Court should deny Oatman's motion for class certification.

## STATEMENT OF FACTS

**A**.     **Oatman Never Discussed Donation Allocation With An InfoCision Employee.**

Sometime more than twenty years ago, Oatman received a call from an unknown person soliciting a donation on behalf of the ADA.  On that call, Oatman asked the caller if "most of the money" she donated would go to the charity.  She asked that question because she knew that charities had "administrative costs."  Oatman claims she was told that "most of the money would be going to the charity," but that the caller never gave her any specific percentage.  According to Oatman, this topic came up only because she asked about it; the caller did not raise it.  Oatman testified that she never asked about this topic again on any subsequent calls with the ADA.

In Oatman's own words:

Q.     [W]hen was the first call that you received on behalf of the ADA?
A.     I don't remember the first time.

Q.     Was it more than 20 years ago?
A.     Yes.

[ . . . ]

Q.     Do you recall what specific question you asked of the ADA about how much goes to the charity 20 years ago?
A.     I asked them if I contribute to this charity, would most of this money go to the charities?  Because I knew about administrative costs.  So I wanted to know if

---

[1] Oatman moved for certification based on the class definitions in both her original and amended complaints. Accordingly, InfoCision separately responds to each class definition.  On July 26, the Court granted Oatman's motion for leave to file her Amended Complaint.  InfoCision has moved for reconsideration of the Court's order.  Even if InfoCision's motion is denied, the portions of this brief addressing the original class definition apply to the amended class definition because the amended class definition includes all persons Oatman sought to include in the original class, among others.

2

most of the money was going to the charity or was going for administrative.

Q.    I take it you don't know what exact words you used in asking that question to
       the ADA approximately 20 years ago?
A.    Of course I don't remember, no.

Q.    Do you recall exactly the response that was given, and to whatever question you
       asked of the ADA approximately 20 years ago?
A.    I was told that most of the money would be going to the charities.

Q.    And I take it this only came up because you asked the question of the person
       who was calling you?
A.    That's correct.

Q.    In other words, they didn't come out and volunteer how much would go to the
       charity?
A.    That's correct.

Q.    And then in years after that initial call, in all the years after that initial call, you
       didn't ask that question, correct?
A.    Correct.

Q.    And, therefore, you didn't receive a response or a representation about how
       much would go to the charity in subsequent years?
A.    Correct.

(Ex. 1 at 107:14–109:8.)

Oatman said the same about the calls she received on behalf of the ACS and the AHA.

Specifically, Oatman testified that about 20 years ago, she received her first calls on behalf of those

charities, though she does not know who placed those calls.  Oatman claims that she asked how the

charities would allocate her donations and was told that "most of the money would go to the

charity."  (*Id.* at 109:9–112:19.) She never discussed donation allocation on any subsequent calls

she received on behalf of the ACS or the AHA because she "assumed the answer was the same."

(*Id.* at 89:16-24.)  In fact, Oatman testified that she has had no conversations with the Named

Charities concerning donation allocation within the last five years.  (*Id.* at 69:16–70:22, 89:16-24.)

In 1996, years after these initial calls, InfoCision first began placing calls on the ADA's behalf.  (Ex. 2 ¶ 14.)  In 1997, InfoCision first began to conduct calls for the AHA.  (*Id.* ¶ 15.)  In 1998, InfoCision first began to conduct calls on behalf of the ACS.  (*Id.* ¶ 16.)

**B.      InfoCision's Representations to Donors and Volunteers Are Not Uniform.**

InfoCision conducts fundraising campaigns for charities, soliciting donors or volunteers (who solicit others to donate).  (*Id.* ¶ 4.)  The scripts that InfoCision uses vary across charities, campaigns, states, and years.  (*Id.* ¶¶ 7–8.)   Scripts also vary from call to call even within a given campaign.  That is because InfoCision employs interactive scripting software, which permits communicators to select language relevant to a wide variety of topics that may arise in the course of a dialogue.  So the script in front of InfoCision's communicators changes from call to call, depending on where each conversation leads.  (*Id.* ¶¶ 5–6.)  The scripts are, however, common in one respect—they call for communicators to discuss donation allocation only if the call recipient raises the issue.  (*Id.* ¶ 7.)  Accordingly, the suggested disclosures for donation allocation appear on "back cards," which communicators access only if they receive a question on that topic.  (*Id.*)

A person who pledges to donate or volunteer usually gets a follow-up letter and/or phone call from InfoCision.  (*Id.* ¶ 9.)  Volunteers receive "kits" containing solicitation letters to hand-deliver or mail to friends, family, and/or neighbors.  (Ex. 3 ¶ 4.)  The follow-up letters and kits also vary across charities, campaigns, states, and years.  (Ex. 2. ¶ 9.)  These written materials, which Oatman does not contend are misleading, provide relevant additional information including state-mandated disclosures; web sites about the charity, campaign, disease, and/or InfoCision; and telephone numbers to call with questions.  (*Id.*)

**C.      Oatman Cannot Identify Class Members From InfoCision's Records.**

InfoCision tracks the date, time, and phone number of its calls, as well as the "disposition code" (i.e., whether the recipient agreed to donate or volunteer, whether she asked to be placed on

4

the do-not-call registry, and so forth).  (Ex. 3 ¶¶ 8–9, 15.)  InfoCision also retains digital recordings of millions of calls with a positive disposition (i.e., "yes" responses to solicitations).  (*Id.* ¶¶ 8–9, 19.)  But InfoCision does not track which of its millions of calls include a discussion of donation allocation.  (*Id.* ¶ 9.)  And before litigation, InfoCision did not retain recordings of all positive-disposition calls.  (*Id.* ¶ 18.)

### D.  Oatman Did Not Donate to the Named Charities During the Class Period.

Oatman claims that every year during the class period, she donated $20 to $25 to the Named Charities.  (Ex. 4 at 3.)  But Oatman has produced nothing to back up this assertion.[2]  In fact, the Named Charities' records show that Oatman did not make any donation *at all* to them during the class period, much less a donation through InfoCision.  (Ex. 7 ¶ 4 ; Ex. 8 ¶ 4; Ex. 9 ¶ 4; Ex. 3 ¶ 14.)[3]

## LEGAL STANDARD

A district court must conduct a rigorous analysis of Rule 23's factors.  *Gen. Tel. Co. of the SW v. Falcon*, 457 U.S. 147, 161 (1982).  Plaintiffs bear the burden of showing that they can satisfy each of those factors.  *Wal-Mart, Inc. v. Dukes*, 131 S. Ct. 2541, 2551–52 (2011); *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996).  They must do so with evidence; unsupported allegations and speculation cannot carry that burden.  *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013); *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 221 (2d Cir. 2008), *abrogated in part on other grounds, Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).

---

[2] Oatman testified that she had a check register purportedly showing a donation to the ADA in 2009, but that she lost the register after this case was filed.  (Ex. 1 at 23:24–24:16, 25:20–26:17.)

[3] Oatman has produced a single page from a bank statement, showing that in April 2012, she donated $25 to "Cancer Support."  (Ex. 5 (Bank Statement).)  Cancer Support is an affiliate of "Cancer Fund of America." (Ex. 6 (Cancer Support webpage).)  InfoCision has never worked for either organization.  (Ex. 2 ¶ 17.)  And InfoCision has not worked for the ACS since August 31, 2011.  (*Id.* ¶ 16.)

## ARGUMENT

## I.     OATMAN'S ORIGINAL PROPOSED CLASS CANNOT BE CERTIFIED.

Oatman initially sought (and still seeks) to certify a nationwide class of individuals who InfoCision's communicators told "that a greater percentage of their donation would go to the charitable organization than what the charitable organization actually received," and who donated or volunteered in reliance upon this alleged misrepresentation.  (Mem. at 2.)  This putative class cannot be certified for at least four reasons.  *First*, class membership depends on the content of oral exchanges that are not tracked, so there is no method to distinguish class members from non-class members, and her class is not ascertainable.  *Second*, individual issues of state law predominate, and Oatman cannot export Ohio law to other states to circumvent this problem.  *Third*, because her claims center on oral representations, commonality is lacking and individual fact issues predominate.  And *fourth*, Oatman is atypical of the class she seeks to represent, as she never received from InfoCision any representation about donation allocation, and did not donate to a Named Charity during the class period.

### A.     Identifying The Members Of Her Putative Class Is Impossible.

Oatman must propose "an identifiable, unambiguous class of which" she is a member.  *Pfaff v. Whole Foods Mkt. Group Inc.*, 2010 WL 3834240, *3 (N.D. Ohio Sept. 29, 2010).  She has not come close.  Determining who received any representation about donation allocation, much less a misrepresentation, is impossible.

#### 1.     Without mini-trials, it is impossible to distinguish people who received a representation about donation allocation from people who did not.

Even Oatman recognizes that "not every Class Member may have asked how much of his/her money was paid to InfoCision."  (Mem. at 8.)  In fact, precious few people who received phone calls from InfoCision received a representation about donation allocation.  (Exhibits 12, 13, and 14 contain audio files and transcripts of exemplar calls lacking such a representation.)

To determine how often donation allocation is discussed in InfoCision's calls, InfoCision commissioned Dr. Joseph Sedransk, a Harvard-educated statistician and professor emeritus from Case Western Reserve University, to randomly sample preserved recorded InfoCision calls resulting in a positive disposition.  Analyzing the samples revealed that well under 1% of the people who agreed to donate or volunteer discuss donation allocation, whether the sample is national or Ohio-based, and whether the sample is limited to the Named Charities or includes other charities for which InfoCision works.  (Ex. 10 ¶¶ 4–12; Ex. 3 ¶¶ 19–25; Ex. 11 ¶¶ 16–25.)

And the few calls in the samples that include a discussion of donation allocation follow no pattern; instead, they are spread among different charities, different campaigns, and different years. (Ex. 11 ¶¶ 26–28; *see also* Ex. 38.)  InfoCision's data do not permit Oatman to sort the people who received a representation about donation allocation from the people who did not.  (Ex. 3 ¶ 9.) Instead, the only way to determine which people discussed donation allocation with InfoCision is to listen to each call, one by one—and there are over 7 million calls at issue.  Counsel for InfoCision reviewed a random sampling of approximately 12,000 calls, which took 19 attorneys nearly 425 hours to complete.  Reviewing all 7 million calls from which the sample was taken would take those 19 attorneys over 6 years.  (Ex. 11 ¶¶ 11–14.)[4]  The members of Oatman's putative class are thus not ascertainable.  *Anderson v. United Fin. Sys. Corp.*, 281 F.R.D. 292, 296 (N.D. Ohio 2012); *Givens v. Van Devere, Inc.*, 2012 WL 4092738, *6–*7 (N.D. Ohio Sept. 12, 2012).

> 2.  Even if one could determine which call recipients received a donation-allocation representation, the class's membership would still be unascertainable.

A further problem exists.  Thus far, the discussion has centered on the impossibility of

---

[4] Reviewing all calls would not capture every putative class member, in any event.  Before the litigation began, InfoCision did not retain digital recordings of all calls with a positive disposition.  (Ex. 3 ¶ 18.)

identifying the people who received a donation-allocation representation.[5]  But Oatman's class includes only those people who received a *mis*representation.  Oatman cannot objectively divide the people who received a donation allocation representation into "accurate representation" and "misrepresentation" piles, because determining whether a particular representation is even arguably false depends on the precise question asked and the precise response given.

For example, the few inquiries about donation allocation in InfoCision's random sample vary significantly.  Some asked questions like, "how much goes to the" charity.  (Ex. 15 at 1; Ex. 16 at 1).  Others asked how much goes to specific projects, such as "research" or "fighting cancer." (Ex. 17 at 2; Ex. 18 at 2; Ex. 19 at 1; Ex. 20 at 1.)  Still others asked how much goes "to management," "to operational fees," or "to administration."  (Ex. 21 at 1; Ex. 17 at 2.)  Some people asked how much goes to "people like you" (Ex. 22 at 1), while others generically asked "where does the funding go?"  (Ex. 17 at 2; *see also* Ex. 23 at 2.)

Each of these questions may call for a different response, depending on what the prospective donor or volunteer actually wants to know.  In many cases, the question's intent can never be known without directly asking the donor or volunteer what she meant.  Even then, whether a given response is misleading will depend on the context of the dialogue, as well as the particular campaign's underlying facts.  For instance, InfoCision's charities receive the entire donation (less any processing costs attributable to banks or caging vendors).  (Ex. 3 ¶ 3.)  Each dollar is allocated per the charity's annual budget breakdown—for example, 75% to core mission, and 25% to overhead, including fundraising costs.  The money that InfoCision receives for its services comes from the charity and is part of the charity's annual overhead expenditure.  (Ex. 2 ¶ 18.)  InfoCision

---

[5] Oatman counters that she can identify class members by cross-checking InfoCision's call lists with charities' donor lists.  (Mem. at 5.)  That process would not work because it would yield a list primarily of people who received no donation-allocation representation at all.  *See supra* pp. 6–7.

is paid a flat rate per call or per volunteer.  (*Id.*)

So, a communicator's response to a question like "how much goes to the charity" will vary depending on these facts and on the communicator's understanding of what the prospective donor is asking about.  Some communicators may note only that the charity gets all the money in the first instance.  Others explain that all of the donations go to the charity in the first instance, and the charity allocates a set percentage toward programs and services.  (Ex. 20 at 1; *see also* Ex. 21 at 1.) Others yet provide additional contextual facts or respond to specific follow-up questions.  For example, one communicator explained:

> *Communicator*:  Approximately 79 cents of every dollar spent by the American Heart Association goes directly towards programs and initiatives. Let's see here, the contract between InfoCision and American Heart Association is not percentage-based, it's a fixed fee.  Um, but the American Heart Association does receive a minimum guarantee as required by law.
>
> *Recipient*:  This is how much?
>
> *Communicator*:  The minimum guarantee is 40% . . . , but we all hope and expect that they will receive substantially more.  It depends on how much, you know, how many phone calls that are made, that kind of thing.  That's what we're, you know, we're paid based on.  We're not paid on a percentage of how much is collected.
>
> (Ex. 16 at 1–2.)

These few examples show why Oatman's proffered class is not ascertainable.  Even if Oatman could identify the calls discussing donation allocation (and she cannot), the Court could not determine whether a given representation was untrue or misleading without taking individualized evidence as to each call.  The questions asked are not uniform and are often ambiguous.  The responses are thus not uniform and may be more or less responsive depending on the underlying facts and the particular dialogue.  Adjudicating which representations were true or untrue would require thousands of mini-trials in which each recorded conversation was analyzed, and testimony and evidence taken from each participant on the call.  When such "extensive and individual fact-

finding or 'mini-trials'" are necessary, a class—by definition—is not ascertainable.  *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 593 (3d Cir. 2012); *see also Pastor v. State Farm Mut. Auto. Ins. Co.*, 487 F.3d 1042, 1047 (7th Cir. 2007) (Posner, J.).

### B.  Individual Issues Predominate over Common Issues, and A Class Proceeding Is Not The Superior Method of Litigation.

Nor can Oatman satisfy Rule 23(b)(3)'s twin requirements that common issues predominate over individual issues and that a class action is the superior method of proceeding.[6]

#### 1.  Individual issues of law predominate.

Oatman pursues three common-law claims on behalf of a nationwide putative class.  She seeks to sidestep the difficulty of instructing a jury on 51 jurisdictions' laws by claiming that the Court can export Ohio law to the other 50 jurisdictions in which putative class members may reside, but she offers no support for this proposition.  As InfoCision set forth in its motion to strike, due process prohibits applying a single state's law to putative class members throughout the country.  [ECF #10-1 & #15; *Phillips Petroleum v. Shutts*, 472 U.S. 797, 821–22 (1985); *Pilgrim v. Universal Health Card*, 660 F.3d 943, 948–49 (6th Cir. 2011).]  This alone warrants denying certification.

#### 2.  Individual fact issues regarding misrepresentations predominate.

Also, individualized fact issues dwarf any common issues that may exist.  Oatman's claims are based on her allegation that InfoCision misrepresented how the Named Charities allocate donations.  Oatman asserts—repeatedly and without support—that InfoCision uses "uniform scripts" containing misrepresentations about donation allocation.  (Mem. at 10, 11, 15.)  Not so.

---

[6] For the reasons stated at pages 6–7 of InfoCision's Reply in Support of Motion to Strike [ECF #15], which InfoCision hereby incorporates, Oatman cannot avoid Rule 23(b)(3)'s additional requirements by characterizing her class as a Rule 23(b)(2) class.  Oatman seeks primarily monetary relief, to be paid either to the class members or to the charities, and "claims for monetary relief . . . may not [be certified under Rule 23(b)(2)], at least where (as here) the monetary relief is not incidental to the injunctive or declaratory relief." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011).

*First*, each charity's script is different, the scripts change from campaign to campaign, and many charities run multiple campaigns in a given year.  The Named Charities alone used at least 40 different scripts over the class period.  (Ex. 2 ¶ 8)  And as Oatman notes, InfoCision works for over 40 different charities (Mem. at 1), which also use different scripts (Ex. 2 ¶ 8).  *Second*, InfoCision uses dynamic scripting software to insert the relevant state-mandated disclosures—which vary among the states—into each call's script.  (*Id.* ¶¶ 5–6.)

*Third*, InfoCision's software permits communicators to choose relevant "back cards" in response to questions.  These back cards generally offer multiple different responses to questions that might arise concerning donation allocation, and the communicator selects which response, if any, best answers the question asked.  (*Id.* ¶¶ 6–7.)  Thus, the scripted allocation response differs even within a given campaign, depending upon the nature of the conversation.  And *fourth*, Oatman cannot credibly contend that InfoCision "uniformly" fails to disclose estimated campaign-specific fundraising costs.  Indeed, the scripts themselves belie this contention, offering disclosures such as:

- "Overall, only 22.7 percent of your gift is used for the fundraising and administration costs necessary to continue our programs.  Our goal for this specific phone campaign is that half the funds raised will go directly to the Heart Association." (Ex. 24.)

- "Since we are currently in the midst of our campaign we are not exactly sure what the total cost of the fundraising will be for this particular campaign but estimate at least 14% will go to American Heart Association."  (Ex. 25.)

- "For this specific phone campaign, it is estimated that American Diabetes Association will receive approximately 35% of the funds raised."  (Ex. 26.)[7]

The variations in InfoCision's scripts thus preclude certification.  *Moore v. PaineWebber, Inc.,* 306 F.3d 1247, 1256 (2d Cir. 2002) (plaintiffs failed predominance test where liability turned on oral misrepresentations because the several "telephone scripts upon which plaintiffs rely vary

---

[7] For additional examples, see Exhibits 29, 30, 31, 32, 33, 34, & 35.

significantly").

And regardless of what the scripts say, the recorded phone calls provide the best measure of what representations putative class members actually received. *Freid v. Nat'l Action Fin. Serv., Inc.*, 2011 WL 1547257, *4 (D.N.J. Apr. 20, 2011) ("[e]ven if a plaintiff could establish which script was used, this is still weak circumstantial evidence of what was actually said in the message, and how it was said.")  As shown above, those representations varied considerably because they occur in the context of an inherently variable dialogue. *See supra* at Pt. I.A.

No wonder, then, courts—including this one—routinely deny class certification in cases involving oral representations.  In *Faktor*, the plaintiff alleged that a plastic-surgery group orally misrepresented the nature of its procedures. *Faktor v. Lifestyle Lift*, 2010 WL 271346, *1 (N.D. Ohio Jan. 15, 2010).  The Court rejected the plaintiff's proposed nationwide class of people who paid deposits after consultations, noting that oral representations are "inherently variable." *Id.* at *5.  It concluded that individual testimony was the only practical means of determining what each class member actually heard before making a deposit, and that these problems were so endemic that common questions not only failed to predominate, but did not exist. *Id.* at *7 (concluding that plaintiffs could not establish commonality); *Moore*, 306 F.3d at 1253, 1255–56 (agreeing with other circuits that "oral misrepresentations are presumptively individualized"; "each plaintiff must prove that he or she personally received a material misrepresentation").

The same is true here.  Oatman incants the mantra of uniformity, stating over a dozen times that this case involves "uniform" representations.  But she offers nothing to support this contention, and she is wrong to suggest that InfoCision's use of scripts eradicates the individualized issues attendant oral misrepresentations.  Oatman's decision to ignore that variance cannot make it vanish.

       3.    <u>Individual fact questions regarding the class members' reliance predominate</u>.

Individualized fact issues regarding reliance, an element of her fraud and negligent-

misrepresentation claims, also predominate.  This Court recently noted that "[f]ederal Courts of Appeal, including the Sixth Circuit, have consistently refused to permit class treatment of fraud-based claims because individual issues of reliance must be resolved."  *Hale v. Enerco Group, Inc.*, 288 F.R.D. 139, 148 (N.D. Ohio 2012) (citing, among other cases, *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 398 (6th Cir. 1998)); *see also McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 223 (2d Cir. 2008) (reliance "cannot be the subject of general proof"); *Thorogood v. Sears, Roebuck & Co.*, 547 F.3d 742, 748 (7th Cir. 2008) (Posner, J.) (same).

In *Hale*, the Court held that reliance cannot be commonly adjudicated because proving that element requires individually examining each class member about both what she understood from the representation at issue and her motivations for entering into the relevant transaction.  The *Hale* Plaintiffs premised their misrepresentation claims upon an allegedly misleading seal of approval. The Court denied certification because "[i]ndividual determinations of reliance" were necessary "to determine the impact of th[e] seal upon . . . the purchaser's motives" and how the purchaser interpreted the seal.  *Hale*, 288 F.R.D. at 150.  Just the same, in *Faktor*, the Court recognized that reliance "necessarily need[ed] to be determined on an individualized basis."  2010 WL 271346, at *6.  After all, "without an inquiry into what each class member heard and whether that class member would have elected to [enter the transaction] even if they knew 'the truth,' the Court could not ascertain whether the Defendants in fact committed fraud."  *Id.*

Here, the need to examine each putative class member's motivations for donating or volunteering, as well as what she understood from the communicator's donation-allocation representation, preclude certification.  Oatman donated to the Named Charities because her friends and family members have experienced cancer, diabetes, and heart disease.  (Ex. 1 at 113:17-24.) But she acknowledges that other people give for different reasons.  (*Id.* at 116:15-25)  Similarly, Oatman recognizes that different people place different weight upon the donation-allocation issue;

13

while she cares only that the charity spends "most of" her donation on its core mission, other people may have different thresholds.  (*Id.* at 102:18-22, 117:1-18.)

Moreover, the varied exchanges on this topic demonstrate that there could not have been a common understanding that resulted from the various allocation representations given.  *Supra* at 7–9.  And the follow-up mailings and phone calls provide donors and volunteers with additional information, which only complicates the reliance question.  Accordingly, the only way to determine whether—and to what extent—a given donor or volunteer relied upon the allocation representation that she received is to take individualized evidence from her.  Nor can reliance be presumed in this case, as this is not a securities-fraud case, advancing the fraud-on-the-market theory.  *Faktor*, 2010 WL 271346, at *6.

4.    <u>Individualized issues regarding the fact and amount of damage predominate for people who agreed to volunteer</u>.

For putative class members who agreed to volunteer, additional individual fact issues arise.  There is no singular, unified volunteer experience.  Some people, like Oatman in 2010, agree to receive a volunteer kit but do not actually solicit donations.  (Ex. 1 at 73:15–74:3.)  Some volunteers solicit donations from others in person, while others use the mail.  (Ex. 1 at 74:14-19; Ex. 27 at ¶¶ 5–6.)  Some people behave a certain way one year, and a different way the next.  (*See* Ex. 28 at ¶¶ 6–7 (declaration from one volunteer explaining that he canvassed his neighborhood one year, but sent his daughter to do so the following year).)

InfoCision's records do not capture these differences.  True enough, they show who *pledged* to volunteer, but InfoCision has no way of knowing whether a person who pledged actually followed through.  And while the charities may have lists of people who returned a "fulfilled" volunteer kit, they have no way to measure whether a given person who did not return a kit solicited donations, but came up empty-handed.  Moreover, fulfilled kits often contain commingled donations from multiple people, including the volunteer.  (*See* Ex. 1 at 80:10–81:12, 85:25–86:13.)

14

Neither InfoCision nor the charities have any way to determine who donated what funds.  Thus,

determining the fact and extent of any volunteer's damage requires individual inquiries, thwarting

certification.[8]  *E.g.*, *Newton v. Merrill Lynch, Pierce, Fenner, & Smith, Inc.*, 259 F.3d 154, 190 (3d

Cir. 2001) ("Because economic loss cannot be presumed, ascertaining which class members have

sustained injury means individual issues predominate over common ones.")

### C.  <u>Oatman Is Not Typical of The Class She Seeks To Represent.</u>

Finally, Oatman cannot represent people who received donation-allocation representations

because she is not typical of them.  Rule 23(a)(3)'s typicality prong requires a putative class

representative to show that "as goes the claim of the named plaintiff, so go the claims of the class."

*Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc).  In other words,

"[t]ypicality determines whether a sufficient relationship exists between the injury to the named

plaintiff and the conduct affecting the class, so that . . . in pursuing his own claims, the named

plaintiff will also advance the interests of the class members."  *Id.* (citation omitted).

Here, no such relationship exists because Oatman is not a member of her own class.  She

conceded in her deposition that the representations about which she complains occurred more than

20 years ago, before InfoCision even worked for the Named Charities.  (Ex. 1 at 107:12–112:19;

Ex. 2 ¶¶ 14–16.)  She also testified that she has no idea whether InfoCision made any of those

alleged misrepresentations.  (Ex. 1 at 23:5-19, 59:9-18, 97:25–98:3.)  And she offers no evidence

that InfoCision did.

Were that not enough, while Oatman claims to have donated $20 to $25 per year to each of

---

[8] That Oatman misremembers certain facts about her volunteer efforts further manifests the problem.
Oatman testified that in 2009, she collected approximately $50 from her neighbors, added about $20 of her
own money, and returned the solicitation kit to the ADA.  (Ex. 1 at 80:10–81:12, 85:25–86:13.)  But the
ADA's records reflect that the only solicitation kit Oatman ever returned contained $30 and was from a
campaign (a) that predated the class period, and (b) for which the ADA hired a vendor other than InfoCision
to recruit volunteers.  (Ex. 8 (ADA Decl.) ¶ 5.)

the Named Charities during the class period, the charities' records reveal that, in fact, she made no such donations. (Ex. 7 ¶ 4; Ex. 8 ¶ 4; Ex. 9 ¶ 4.) The ADA's records show that Oatman raised $30 as a volunteer, but she raised that money before the class period and for a campaign run by a telemarketer other than InfoCision. (Ex. 8 ¶ 5.)

## II. OATMAN'S AMENDED CLASS DEFINITION ONLY MAKES MATTERS WORSE.

Oatman's amended complaint proposes a substantially broader class definition. The new allegations are imprecise at best, but they appear to sweep into the class *every* donor or volunteer who received *any* misrepresentation—including some not identified—from InfoCision during the class period. Specifically, Oatman defines the class to include anyone who received a call from, or made a call to, an InfoCision representative who "directly or impliedly misrepresented facts" material to the prospective donor or volunteer, "including but not limited to": (a) facts about donation allocation, (b) "that the call was on behalf of the non-profit/charitable organization when it was on behalf of InfoCision, in whole or in part," and/or (c) "that the amounts of funds available to match prospective donations was either less than that represented or when there were no such matching funds available." (Am. Compl. ¶ 70.) Expanding the class in this fashion solves none of the problems identified above, and instead makes certification exponentially more inappropriate.

### A.   Oatman Offers No Evidence Supporting Certification of the Amended Class.

To start, Oatman has introduced no evidence demonstrating that her new allegations are common to all putative class members, much less evidence satisfying the other Rule 23 elements. In fact, Oatman has not even shown that the new allegations apply to her. The Supreme Court has emphasized that "a party seeking to maintain a class action 'must affirmatively demonstrate his compliance' with Rule 23" and must do so "through evidentiary proof." *Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). "The Rule 'does not set forth a mere pleading standard.'" *Id.* (quoting *Dukes,* 131 S. Ct. at 2551–52). Oatman's unsupported allegations cannot satisfy her

16

burden under Rule 23 as a matter of law, and alone provide a basis to deny certification.

**B.**   **Oatman's Nebulous Amended Class Definition Is Uncertifiable, Under Either of Its Possible Constructions.**

Oatman's unintelligible new class definition also does not solve the ascertainability problems with her initial class definition.  The new definition itself suggests that it includes everyone who received *any* misrepresentation from InfoCision, including "implied" misrepresentations and misrepresentations that Oatman does not bother to specify.  (Am. Compl. ¶ 70.)  Her class-certification brief, however, suggests that she seeks to sweep into her new class *every single donor or volunteer* to whom InfoCision spoke on behalf of any of its charities during the class period.  (Mem. at 5.)  Neither construction is workable.

Taking her definition at face value, the proposed new class is not certifiable because it is a fail-safe class.  As written, the class definition includes only those people who received a material misrepresentation, relied upon it, and suffered damage—in other words, anyone who can prove a fraud claim against InfoCision.  But that is the very definition of an impermissible fail-safe class. *Randleman v. Fidelity Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011).  Oatman's new class definition would thus allow a putative class member to seek a remedy for any misrepresentation he can prove (including implied or unspecified ones) but avoid a judgment if he fails to prove a misrepresentation. *Id.*  So, those class members either win by proving their claim or lose and, by virtue of losing, are not in the class and thus not bound.  This definition is impermissible because it is fail-safe. *Genenbacher v. CenturyTel Fiber Co. II*, 244 F.R.D. 485, 488 (C.D. Ill. 2007).

The bloated alternative construction in Oatman's brief fares no better.  There, Oatman suggests that she need only identify InfoCision's charity clients.  According to Oatman, *every* donor or volunteer who InfoCision solicited is a class member, because all of them "were subject to

uniformly misleading scripts"[9] and/or some other unspecified unlawful conduct.  (Mem. at 5.)
Oatman offers no evidence that this vague theory is amenable to unitary adjudication with common
proof.  Nor does she offer evidence that all donors and volunteers suffered a common harm—or any
harm at all.  Indeed, Oatman lacks evidence that even *she* has been harmed.

Oatman's proposed class is also overbroad on its face, since "[a] properly defined class
includes only members who would have standing to bring suit in their own right."  *Anderson v.*
*United Fin. Sys. Corp.*, 281 F.R.D. 292, 295 (N.D. Ohio 2012) (quotation omitted).  Moreover, like
the overbroad class definition in *Dukes*, Oatman's proposed class also lacks any "glue" holding the
key facts together across the class, so the class members cannot have a common answer to the key
question:  *what false statement did I receive?  Dukes*, 131 S. Ct. at 2552.

### C.    Oatman is Not Typical of the Class She Seeks to Represent.

Beyond the typicality problems explained above, Oatman is not typical of the class members
she now seeks to represent.  None of the new factual allegations even apply to her.  Oatman never
alleges she donated in any matching-fund campaign that InfoCision conducted, and InfoCision's
records confirm that she did not.  (Ex. 2 ¶ 19.)  InfoCision's records also reflect that Oatman
received no communication from InfoCision in which gift matching was ever discussed.  (*Id.*)

As for the "on behalf of" allegations, Oatman concedes that InfoCision disclosed to her that
it was a professional solicitor.  (Mem. at 6.)  And Oatman testified that she knew the charities she
donated to had "administrative costs" such as fundraising.  (Ex. 1 at 108:4-5.).  Oatman cannot be
typical of donors or volunteers who claim they did not know that InfoCision had a financial interest

---

[9] Curiously, Oatman also alleges that InfoCision's scripts "usually conform legally."  (Mem. at 1.)

in the calls that it made to them.[10]  *Stout v. J.D. Byrider*, 228 F.3d 709, 717 (6th Cir. 2000); *see also Godec v. Bayer Corp.*, 2011 WL 5513202, *2, *5–*6 (N.D. Ohio Nov. 11, 2011).  The Court should deny certification for this reason as well.

> **D.**    **Commonality is Lacking, and Individual Issues of Law and Fact Predominate.**

Finally, the individualized questions of law and fact implicated by the proposed amended class are overwhelming.  *First*, Oatman still seeks to certify three common-law claims (including fraud) on behalf of a nationwide class of individuals.  As explained, the laws of the 51 jurisdictions at issue vary materially and preclude certification on this basis alone.  [*See* ECF #10-1, & #15.] *Second*, Oatman still seeks to represent people who received misrepresentations concerning donation allocation.  Thus, all of the certification problems identified above remain.

*Third*, Oatman has compounded those problems by adding to the class people who allegedly received:  (a) unspecified misrepresentations, (b) "implied" misrepresentations, and (c) and multiple different types of misrepresentations.  This Court has consistently held that only the narrowest of fraud class actions can be certified, and only then if the representations are identical or nearly identical.  *Faktor*, 2010 WL 271346, at *6.  Here, Oatman cannot possibly establish commonality or predominance because the alleged representations at issue materially differ across class members *according to the class definition itself*.  Cramming three different types of representations into the class definition precludes certification; stating that the class is "not limited to" people who received those alleged representations only exacerbates the problem.  (Am. Compl. ¶ 70.)

The Supreme Court made this point abundantly clear:

---

[10] This argument is specious in any event.  By identifying itself as a professional solicitor, InfoCision is disclosing to potential donors that it is paid.  *See Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 799 (1988) (by "disclos[ing] their professional status to potential donors," callers are provided "notice that at least a portion of the money contributed will be retained"; "[d]onors are also undoubtedly aware that solicitations incur costs, to which part of their donation might apply").

> [C]laims must depend upon a common contention—for example, the assertion of discriminatory bias on the part of the same supervisor.  That common contention, moreover, must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

*Dukes,* 131 S. Ct. at 2551; *see also* Fed. R. Civ. P. 23, Adv. Cmte. Notes to the 1966 Amendment to subdiv. (b)(3) ("[A]lthough having some common core, a fraud case may be unsuited for treatment as a class action if there was material variation in the representations made or in the kinds or degrees of reliance by the persons to whom they were addressed.").  And this past Term, the Court applied that holding in *Comcast,* noting that "[t]he permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless."  *Comcast,* 133 S. Ct. at 1434–35.  The same is true of the permutations at issue here, involving unspecified—and potentially infinite—theories of liability, 7+ million phone calls, and call recipients nationwide.

If, as here, the alleged representations themselves materially vary from class member to class member, the truth or falsity of those representations is not capable of classwide resolution "in one stroke."  Nor could questions of reliance on those differing representations ever be common across the class.  *E.g., Faktor,* 2010 WL 271346, at *6.  Thus, the proposed amended class fails Rule 23's commonality prong, as well as the Rule's predominance and superiority requirements.

## <u>CONCLUSION</u>

For the reasons set forth above, the Court should deny Oatman's motion.

Dated: July 29, 2013

M. Errol Copilevitz (*admitted pro hac vice*)
ec@cckc-law.com
Copilevitz & Canter, LLC
310 West 20th Street, Suite 300
Kansas City, Missouri 64108
Telephone:  816.472.9000
Facsimile:  816.472.5000

Respectfully submitted,

/s/ Brett A. Wall
Brett A. Wall (0070277)
bwall@bakerlaw.com
Terry M. Brennan (0065568)
tbrennan@bakerlaw.com
Michael D. Meuti (0087233)
mmeuti@bakerlaw.com
David A. Carney (0079824)
dcarney@bakerlaw.com

Baker & Hostetler LLP
PNC Center 1900 East 9th Street,
Suite 3200, Cleveland, Ohio 44114-3485
Telephone: 216.621.0200
Facsimile: 216.696.0740

*Attorneys for Defendants InfoCision, Inc. and InfoCision
Management Corporation, A/K/A IMC*

**CERTIFICATE OF SERVICE**

I certify that on the 29th day of July 2013, the foregoing was filed electronically.  Notice

of this filing will be sent to all parties by operation of the Court's electronic filing system.

Parties may access this filing through the Court's system.

/s/ Brett A. Wall _____
An Attorney for InfoCision