**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **DORA OATMAN,** | : | Case No. 1:12-cv-02770 |
| Plaintiff, on her own behalf and on Behalf of others similarly situated, | : | Honorable James S. Gwin Magistrate Greg White |
| | : | |
| v. | | |
| | : | |
| **INFOCISION, INC.,** *et al.*, | : | |
| Defendants. | : | |
| | : | |

---

**PLAINTIFF'S REPLY MEMORANDUM IN SUPPORT OF CLASS CERTIFICATION**

---

Dennis E. Murray, Sr. (0008783)
Margaret M. Murray (00066633)
Charles M. Murray (0052083)
Florence J. Murray (0080292)
Christopher W. Tackett (0087776)
MURRAY & MURRAY CO., L.P.A.
111 E. Shoreline Drive
Sandusky, Ohio  44870
Telephone:  (419) 624-3000
Facsimile:   (419) 624-0707
Email: dms@murrayandmurray.com
mmm@murrayandmurray.com
cmm@murrayandmurray.com

fjm@murrayandmurray.com
cwt@murrayandmurray.com

J.M. Kelley III (0061990)
John P. O'Neil (0067893)
Phillip A. Kuri (0061910)
ELK & ELK Co., Ltd.
6105 Parkland Blvd.
Mayfield Heights, Ohio 44124
Telephone:  (440) 442-6677
Facsimile:  (877) 355-1355
Email: jkelley@elkandelk.com
joneil@elkandelk.com
pkuri@elkandelk.com

Attorneys for Plaintiff

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................... ii

STATEMENT OF THE ISSUES TO BE DECIDED ................................................. 1

SUMMARY OF THE ARGUMENT ........................................................................ 1

I.     LEGAL ANALYSIS ......................................................................................... 1

        A.     Implicit Requirements – Federal Rule of Civil Procedure 23 ................... 1

                1.     Identifiable and Unambiguous .................................................. 2

                2.     Representatives as a Member of the Class ................................. 4

        B.     Threshold Requirements – Fed.R.Civ.P. 23(a) ........................................ 7

                1.     Numerosity – Fed.R.Civ.P. 23(a)(1) ......................................... 7

                2.     Commonality – Fed.R.Civ.P. 23(a)(2) ..................................... 7

                3.     Typicality – Fed.R.Civ.P. 23(a)(3) .......................................... 10

        C.     Damages Class – Fed.R.Civ.P. 23(b)(3) ................................................ 10

                1.     Predominance – Fed.R.Civ.P. 23(b)(3)(A) ............................. 11

                      a.     Predominance of Law ................................................... 11

                      b.     Predominance of Fact .................................................... 14

                2.     Superiority – Fed.R.Civ.P. 23(b)(3)(B) ................................... 19

II.     CONCLUSION ............................................................................................. 20

## TABLE OF AUTHORITIES

**CASES:**                                                                                    **Page:**

*Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997) ...................................................................2

*American Interstate Ins. Co. v. G & H Service Ctr., Inc.*, 112 Ohio St.3d 521, 2007-Ohio-608 ..11

*Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct. 1184 (2013) ......................1, 11

*Campbell v. First Am. Title Ins. Co*., 269 F.R.D. 68 (D.Me. 2010)...............................................20

*Chavez v. Blue Sky Natural Beverage Co.*, 268 F.R.D. 365 (N.D. Cal. 2010) ............................12

*Dale v. Daimler Chrysler Corp.* 204 S.W.2d 151, 179-80 (Mo. 2006).........................................20

*Dallman Acquisition, LLC v. Dallman*, U.S. Dist. Ct. No. 2:10-cv-007, 2011 U.S. Dist. LEXIS
20138 (S.D. Ohio, March 1, 2011) ................................................................................................11

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)..................................................................1-2

*Faktor v. LifeStyle Lift*, U.S. Dist. No. 1:09-CV-511, 2010 U.S. Dist. LEXIS 3149
(N.D. Ohio, Jan. 15, 2009)............................................................................................................17

*Genenbacher v. Century Tel Fiber Co. II, LLC*, 244 F.R.D. 485 (C.D.Ill. 2007) ........................20

*Glazer v. Whirlpool*, 2013 FED App. 0180P, 2013 U.S. App. LEXIS 14519 (2013) ........... 2, 7-11

*In re Inter-Op Hip Prosthesis Liab. Lit.*, 204 F.R.D. 330 (N.D. Ohio 2001) ...............................19

*Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802 (7th Cir. 2012) ........................................2

*Morgan v. Biro Mfg. Co., Inc.*, 15 Ohio St.3d 339, 474 N.E.2d 286 (1984) ................................11

*Pevets v. Crain Communs, Inc.*, 6th Dist. No. OT-10-023, 2011-Ohio-2700...............................12

*Pfaff v. Whole Foods Market Group Inc.*, U.S. Dist. No. 1:09-cv-02954, 2010 U.S. Dist.
LEXIS 104784 (N.D. Ohio, Sept. 29, 2010)............................................................................. 17-19

*Powers v. Hamilton County Pub. Defender Comm'n*, 501 F.3d 592 (6th Cir. 2007)....................19

*Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347 (6th Cir. 2011) .....................................19, 20

*Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781 (1988)..............................................7

*Sprague v. GMC*, 133 F.3d 388 (6th Cir. 1998) ....................................................................10, 18

*State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943 (10th Dist.).......................9, 18

*Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188 (6th Cir. 1988)..................................................19

*Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011) .............................................................1

**RULES:**

Fed.R.Civ.P. 23 ....................................................................................................................... 1

Fed.R.Civ.P. 23(a) .................................................................................................................. 7

Fed.R.Civ.P. 23(a)(1)........................................................................................................ 1, 2, 7

Fed.R.Civ.P. 23(a)(2) ........................................................................................................... 1, 7

Fed.R.Civ.P. 23(a)(3) ......................................................................................................... 1, 10

Fed.R.Civ.P. 23(a)(4)............................................................................................................. 1

Fed.R.Civ.P. 23(b)(2)...................................................................................................... 1, 10, 20

Fed.R.Civ.P. 23(b)(3)............................................................................................. 1, 10, 17, 18, 20

Fed.R.Civ.P. 23(b)(3)(A) .......................................................................................................11

Fed.R.Civ.P. 23(b)(3)(B) .......................................................................................................19

Fed.R.Evid. 201(c)(2) .............................................................................................................5

**OTHER AUTHORITIES:**

Second Restatement of the Law of Conflicts, § 6 (1971) .............................................................12

Second Restatement of the Law of Conflicts, § 146 (1971) .........................................................11

Second Restatement of the Law of Conflicts, § 148 (1971)...............................................11, 13, 14

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether Plaintiff established that the Amended Class definition is identifiable and unambiguous and that Plaintiff is representative of the Class pursuant to the implicit requirements of Fed.R.Civ.P. 23.

2.      Whether Plaintiff satisfied Fed.R.Civ.P. 23(a)(3) as to typicality of the Named Plaintiff.

3.      Whether Plaintiff established propriety of certification pursuant to Fed.R.Civ.P. 23(b)(3).

## SUMMARY OF THE ARGUMENT

In response to Plaintiff's motion for class certification pursuant to Fed.R.Civ.P. 23, Defendants InfoCision, Inc. and InfoCision Management Corporation (collectively "InfoCision") argue that the class cannot be identified and that Plaintiff is not representative of the Class she seeks to represent, that Plaintiff Oatman's claims are not typical of the Class and that commonality and predominance cannot be established.   InfoCision does not argue that numerosity required by Fed.R.Civ.P. 23(a)(1) is not satisfied, that commonality required by Fed.R.Civ.P. 23(a)(2) is not satisfied as to the Amended Class definition, that the Class Representative or Class Counsel are inadequate or not competent pursuant to Fed.R.Civ.P. 23(a)(4), or that this matter is inappropriate for certification pursuant to Fed.R.Civ.P. 23(b)(2). Accordingly, Plaintiff replies only to those requirements to which InfoCision takes exception.

## I.      LEGAL ANALYSIS

### A.      Implicit Requirements Federal Rule of Civil Procedure 23

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage.  Merits questions may be considered to the extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Amgen Inc. v. Conn. Retirement Plans & Trust Funds*, 133 S.Ct. 1184, 1194-95 (2013), citing *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541, 2552 n.6 (2011); *Eisen v. Carlisle*

1

& *Jacquelin*, 417 U.S. 156, 177 (1974). "[D]istrict courts may not 'turn the class certification proceedings into a dress rehearsal for the trial on the merits.'" *Glazer v. Whirlpool*, 2013 FED App. 0180P, **13, 2013 U.S. App. LEXIS 14519 (2013), quoting with approval *Messner v. Northshore Univ. Healthsys.*, 669 F.3d 802, 811 (7th Cir. 2012).

### 1. Identifiable and Unambiguous Class

Every day, InfoCision employees are involved in 500,000-700,000 calls. Decl. of White, ¶ 16 [Doc #: 48-3; PageID #: 564]. The Class Period in the Amended Complaint runs four years prior to September 27, 2012 to the present. Am. Compl., ¶ 69 [Doc #: 44; PageID #: 430]. InfoCision's argument is not whether Plaintiff can satisfy numerosity pursuant to Fed.R.Civ.P. 23(a)(1) but whether the Class is identifiable and unambiguous.

While individual damages or relief may be encompassed within a class action, it is the small claimant for whom the class action is the best procedure. As noted by the Supreme Court:

> The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Although the sheer number of calls made by InfoCision during the Class Period *appears* unwieldy, it is, in fact, routinely handled in such formats as to allow easily used methods to identify Class Members. "A person who pledges to donate or volunteer usually gets a follow-up letter and/or phone call from InfoCision." Doc #: 48; PageID #: 501 referring to Decl. of White, Doc #: 48-3; PageID #: 562. Although White cautions that these "fulfillment lists" include those who may agree to donate or to solicit their neighbors yet ultimately do not, White *does admit* that nevertheless "InfoCision gathers fulfillment data from either the relevant charity or from the third-party caging operation, depending on how that campaign is structured." *Id.* at ¶¶ 10-12 [Doc #: 48-3; PageID #: 562-

2

63].

Ohio law, the state of InfoCision's principal place of business, requires it to "keep true records of solicitation activities covered by [Chapter 17] or any rule adopted under this chapter. *** The records shall be retained for a period of at least three years."  R.C. 1716.11.  Although White would claim that only audio-recordings of its calls for thirty-days prior to commencement of litigation were maintained, Decl. of White, ¶ 18 [Doc #: 48-3; PageID #: 564], that is untrue, as clearly demonstrated by Exhibits 37-44 from InfoCision's response and the Assurance of Discontinuance executed by InfoCision with the Ohio Attorney General ("OAG") in April of 2012. Indeed Exhibits 37-44 of InfoCision's response consists of audio files listed to by attorneys overseen by present defense counsel and those audio-recordings clearly include records from 2010 to 2012.  Exhibit 11, Decl. of Meuti, ¶¶ 5, 8 [Doc #: 48-11; PageID #: 604].

The Assurance of Discontinuance includes, not only complaints going back to 2004, it also includes review of samples of approximately twenty calls from the time period of OAG's underlying complaint (from 2004 to 2012) sent by InfoCision to the OAG.  For instance, the OAG found that InfoCision failed to "notify twenty-one potential donors at the point of solicitation the name of the professional solicitor as it is on file with the Attorney General during a campaign on behalf of Foundation for Moral Law in 2004 and 2005."  Exhibit 1, ¶ 12. Similarly, the OAG listened to twenty sample calls involving the American Institute for Cancer Research in 2008 and 2009 and found *all calls* violated R.C. 1716.08(B)(1)(a).  *Id.* at ¶ 8.

In support of its argument about the identity of the Class, InfoCision offers the expert opinion of Dr. Joseph Sedransk.  Dr. Sedransk was hired to "determine how often donation allocation is discussed in InfoCision's calls *** to randomly sample preserved recorded InfoCision calls resulting in a positive disposition."  Doc #: 48; PageId #: 504.  According to Dr. Sedransk, he was "asked to select samples that are random, representative and sufficiently large

3

to permit one to conclude, at a high rate of confidence, that the characteristics of the sample also apply to the broader population from which they were drawn."  Doc #: 48-10; PageID #: 590. Dr. Sedransk explains his methodology and erroneously concludes he has met this task.  *Id.* Plaintiff's expert, Dr. Eileen Bridges, has reviewed the Sedransk materials and reports that such conclusion is incorrect, because the methodology was flawed and indeed, inconsistent with his assignment.  Report of Eileen Bridges, Ph.D., attached as Exhibit 2.  Furthermore, Dr. Sedransk and the analysis provided by defense counsel in Exhibit 11 were clearly based only on the former Class Definition.  Dr. Sedrank's entire report is premised upon how much *InfoCision receives* from the donor's money, rather than InfoCision's multiple misrepresentations throughout the solicitations.

InfoCision notes at footnote 5 that Plaintiff postulated in her memorandum in support of certification, that the non-profit/charity clients' records would provide the relevant donors and volunteers for InfoCision campaigns.  [Doc #: 48; PageID #: 505]  InfoCision's Chief Technical Officer explains that InfoCision itself maintains that information in "Fulfillment Lists."  Decl. of White, ¶¶ 10-11 [Doc #: 48-3; PageID #: 562-63].  "For fundraising campaigns, the fulfillment list identifies which people who pledged to donate actually fulfilled some or all of their pledge. *** For volunteer-recruitment campaigns, the fulfillment list identifies the people who agreed to volunteer and then returned at least one of the letters in the volunteer-fundraising kit."  *Id.*

Accordingly, the Class is identifiable under either Class Definition.

## 2.    Representative as a Class Member.

Although InfoCision contends that Oatman did not contribute money during the Class Period, this conclusory assertion is refuted by Plaintiff's testimony.  Plaintiff explained that she began making donations to the American Cancer Society ("ACS") in 2010 or 2011, to the American Diabetes Association ("ADA") in 2007, and to the American Heart Association

4

("AHA") twenty years ago.  Dep. of Oatman, pp. 20-21 (Exhibit 3).  Plaintiff's statements at the outset of her deposition as to the number of years of her donations were corrected later in her testimony.  As demonstrated by InfoCision's Chief of Staff, both ADA and ACS were InfoCision's clients at the times that Plaintiff first donated to each of these nonprofits.  Doc #: 48-2; PageID #: 557.

Plaintiff carefully explained that before considering contributing money to any organization, she asked the caller or the nonprofit entity whether most of her money was going to the charities, not someone else.  *Id.*, pp. 124-25.  Although she would only ask the first time she contributed to each charity how much of *her* money went to the charity; when she had been on telephone calls and someone identified the caller as a professional solicitor, she would have then asked how much of her money was going to the charity.  *Id.*, p. 125.  This fact is important regardless of whether Mrs. Oatman first donated twenty years ago or more recently.

While Mrs. Oatman might well have confused "American Cancer Society" with "Cancer Support Services" as to a most recent donation, Plaintiff offers further evidence of contributions to the ADA, Declaration of ADA notwithstanding.  [Doc #: 48-7]  This evidence includes not only her deposition testimony, but also a declaration of her neighbor solicited by Plaintiff on behalf of ADA within the Class Period; and her letter from the ADA demonstrating that as recently as 2012 Plaintiff was solicited by InfoCision for the ADA.  Exhibit 4 hereto; Exhibit 3 to Mem. In Support of Certification [Doc #: 40-4].

Plaintiff also contributed to InfoCision's other nonprofit clients, Feed the Children and Disabled American Veterans.  Dep. of Oatman, pp. 66, 100, 102; http://www.sos.wa.gov/charities/search_detail_cfr.aspx?cfr_id=66 (State of Washington 2013 list of InfoCision clients, last viewed 08/01/2013).  Pursuant to Fed.R.Evid. 201(c)(2), Plaintiff asks that the Court take judicial notice of this publication.  While Mrs. Oatman not longer recalls

whether the individual answering the telephone of Feed the Children, or the person who called her for Disabled American Veterans worked for InfoCision, this omission would not be unusual for InfoCision.  See, *e.g.*, Declarations of Harrington and of Zuccaro (Exhibit 5-6).  The failure of InfoCision communicators to properly identify themselves either with the legal name of InfoCision or their status as a paid solicitor, permeates the Assurance of Discontinuance entered with the Ohio Attorney General in April of 2012.  ¶¶4-12.  This type of uniform omission and misdirection was the basis for violations of R.C. 1716.08(B)(1)(a).  Indeed, a mere reading of the transcripts which InfoCision filed in opposition to certification demonstrates such violations occurring throughout most calls.

For example, Exhibit 12 shows that the communicator failed to state the full name of InfoCision (which is "InfoCision Management Corporation" until December of 2011 and "InfoCision, Inc." thereafter, Amended Complaint, ¶ 3 [Doc #: 44; PageID #: 416]); does not state InfoCision is a paid solicitor; does not state that he is an employee; never provides the charity's address; and, advised the person solicited to "send the donations back to us" implying that he is with the ADA.  [Doc #: 48-12]  This telephone call violated the minimum standards codified in R.C. 1716.08(B)(1)(a) and (B)(1)(b) and R.C. 1716.14(A)(2) and 16 C.F.R. 310.3(d).

Likewise, Exhibit 17 demonstrates that the communicator did not state the full name of InfoCision; does not state she is a paid solicitor; uses language to imply association ("you have made a huge difference in the lives of cancer patients in your community and we'd love to have your support in a different way this year"); fails to give the address of the charity on whose behalf she is calling; misleads as to the donation allocation; and, implies a direct relationship (about 70% of every dollar received goes to the programs and services we provide).  [Doc #: 48-17]  Exhibit 18 has the same violations and similar misstatements.  [Doc #: 48-18]  Exhibit 20 falls down one step further when the communicator does not even state he/she is a paid solicitor

6

or employee of a paid solicitor.  [Doc #: 48-20]

The very evidence provided by InfoCision refutes its summary conclusion, at footnote 10, that everyone should know that InfoCision will receive some of the money donated *regardless that* its own communicators provide only a minimum amount of often misleading information. Doc #: 48; PageID #: 516.  Additionally, InfoCision's quotes from *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 799 (1988) are refuted by its Declaration from Steve Brubaker "[t]o my knowledge, InfoCision's clients pay for our services for volunteer-recruitment and/or fundraising campaigns from their general operating budgets."  Exhibit 2, ¶ 18 [Doc #: 48-2; PageID #: 557].

Although it would appear that these communicators are going "off-script", the scripts throughout the Class Period uniformly lacked the requisite detail.  For instance, the Fall FY08 Notes to Neighbors campaign for the ACS never instructs InfoCision communicators to state "InfoCision Management Corporation" or the address of ACS.  IMC_00006909 (Exhibit 7).

For these reasons and those previously articulated, Plaintiff Oatman is a representative of the class she seeks to represent, her claims are typical of the Class and she is adequate.

### B.    Threshold Requirements – Fed.R.Civ.P. 23(a)

#### 1.    Numerosity – Fed.R.Civ.P. 23(a)(1)

As noted hereinabove, InfoCision does not challenge this factor which clearly would be satisfied under either Class Definition.  As was true in the original pleading, the Class in the Amended Complaint will easily exceed thousands of class members.  Am. Compl. ¶ 79 [Doc #: 44; PageID #: 433].

#### 2.    Commonality – Fed.R.Civ.P. 23(a)(2)

InfoCision argues that its scripts lack commonality because they "vary across charities, campaigns, states and years" and that they can "also vary from call to call even within a given

campaign."  Doc #: 48; PageID #: 501.  This argument echoes those of Whirlpool in *Glazer*.

In *Glazer*, this Court  considered arguments against certification because the washing machines concerned were the "Duet *** built over a period of two years on two different platforms resulting in production of twenty-one different models during the relevant time frame" were used by consumers with widely varying "laundry habits" and "home environments."  *Id.* at pp. **17-18.  As noted by the Sixth Circuit, these factors cannot defeat commonality because "[w]hether the alleged design defects caused biofilm and mold to accumulate in the Duets is a common issue for all members of the certified class" and because the evidence established that the problems existed "despite variations in consumer laundry habits and despite remedial efforts undertaken by consumers and service technicians to ameliorate the mold problem."  *Id.*

In this case, the evidence adduced to date establishes that the issue common to Class Member is whether InfoCision committed uniform fraud and/or negligent misrepresentation, made misrepresentations by implication or made misleading statements that resulted in donations of money or time.  These issues are more specifically delineated into six common questions:

     a.     Whether the Defendants received donations from the Class Members made for non-profit/charitable organizations, to clients of the Defendants during the Class Period that may be construed to have violated state or federal laws and regulations;

     b.     Whether the Defendants employed a company-wide uniform policy of misrepresenting to the Class Members how much of their contributions would go to or for the benefit of the non-profit/charitable organizations;

     c.     Whether the Defendants knew or should have known that their representations to the Class Members were false and/or were misleading; or otherwise may have violated state and federal laws and regulations;

8

d. Whether the Defendants' receipt of some, or all, of the Class Members' donations is or was unlawful and/or which unjustly enriched such Defendants;

e. Whether this matter is properly maintained by the Class Representative as a nationwide class under Ohio law or federal FTC regulations based in part upon whether the Defendants' principal place of business is Ohio; and,

f. Whether the Defendants have already admitted many of the allegations by paying for the dismissal of a similar class action mounted against them.

Am. Compl., ¶ 72 [Doc #: 44; PageID #: 431-32]. The use of uniforms scripts allows for responses to be the same regardless of the questions asked. The primary difference from one call to another is only which call cards was used. Further, whether InfoCision violated its fiduciary duties with respect to the Class is common to the Class. R.C. 1716.17. See, *e.g.*, *State ex rel. Petro v. Gold*, 166 Ohio App.3d 371, 2006-Ohio-943, ¶ 87 (10th Dist.).

InfoCision misapplies the impact of the audio-recordings by highlighting the variability of the questions posed. As *Glazer* demonstrates, the focus must be InfoCision's representations.

In 1995, the Federal Trade Commission promulgated the Telemarketing Solicitations Rule ("TSR") pursuant to authority of 15 U.S.C. 6102(a)(1). 16 C.F.R. 310.3(d) expressly prohibits "deceptive acts or practices in the solicitation of charitable contributions." "It is a fraudulent charitable solicitation, a deceptive telemarketing act or practices, and a violation of this Rule for any telemarketer soliciting charitable contributions to misrepresent, directly or by implication, any of the following material information:

    ***
(3) The purpose for which any charitable contribution will be used;
(4) The percentage or amount of any charitable contribution that will go to a charitable organization or to any particular charitable program;
    ***

*Id.* InfoCision further is specifically prohibited from making *any* "misleading statement" 16

9

C.F.R. 310.3(a)(4).  As pled in Plaintiff's Amended Complaint, InfoCision is a telemarketer subject to the TSR and subject to these regulations.  Am. Compl., ¶¶ 15-25 [Doc #: 44; PageID #: 419-421].  The TSR and Charitable Solicitation Act, codified by Ohio's General Assembly at R.C. 1716.01 *et seq*. provide objective specific federal and state standards and InfoCision's violations may be easily judged for commonality.

### 3.  Typicality – Fed.R.Civ.P. 23(a)(3)

"Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'"  *Glazer* at **15, quoting *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (*en banc*).  For the reasons previously stated and those articulated in I.A.2. supra, Plaintiff's claims are typical of the Class.

Although InfoCision stated in its Initial Disclosures that it had "[m]aterials related to its communications with Plaintiff," no such materials were ever provided either with InfoCision's initial disclosures or at Plaintiff's first deposition.  A specific request for those materials and any others that InfoCision may have, was served on July 3, 2013.  Yet, while InfoCision has gone to significant lengths to provide audio-recordings and transcripts, in opposition to certification, it has yet to identify *any* recordings or transcripts as to Mrs. Oatman.  Notably, Mr. Brubaker could only attest that "Ms. Oatman has not received a call or communication from InfoCision at any time since 2008 that included a representation about a matching-grant campaign," [Doc #: 48-2; PageID #: 558] implying that InfoCision *has made* solicitation calls to Mrs. Oatman during the Class Period, as to which Mrs. Oatman may or may not have contributed.

### C.  Damages Class – Fed.R.Civ.P. 23(b)(3)

InfoCision included just one footnote briefly alluding to Rule 23(b)(2) certification.  Doc #: 48; PageID #: 507.  Simply because the nature of the relief for a Rule 23(b)(2) class would involve money does not lead to the conclusion that Plaintiff cannot satisfy  Rule 23(b)(2).  Aside

from that brief allusion, no further response is made by InfoCision and Plaintiff respectfully limits her reply as such accordingly.

### 1.        Predominance – Fed.R.Civ.P. 23(b)(3)(A)

Regarding predominance, the *Glazer* decision is instructive.  "A plaintiff class need not prove that each element of a claim can be established by classwide proof: 'What the rule does require is that common questions "*predominate* over any questions affecting only individual [class] members."'"    *Glazer* at **24, quoting *Amgen*, at 1196 (emphasis of the Court), Fed.R.Civ.P. 23(b)(3).

### a.        Predominance of Law

Relying on its motion to strike Plaintiff's original class allegations, since denied as moot, InfoCision asserts that Ohio law cannot apply to the entire Class and that "[t]his alone warrants denying certification."  Doc: 48; PageID #: 507.

Ohio adopted the Second Restatement of the Law of Conflicts (1971) in *Morgan v. Biro Mfg. Co., Inc.*, 15 Ohio St.3d 339, 341-42, 474 N.E.2d 286 (1984); *American Interstate Ins. Co. v. G & H Service Ctr., Inc.*, 112 Ohio St.3d 521, 2007-Ohio-608, ¶ 8.  Unlike the meat grinder in *Morgan*, claims for fraud and misrepresentation are governed by § 148 of the Restatement, rather than § 146.  *Dallman Acquisition, LLC v. Dallman*, U.S. Dist. Ct. No. 2:10-cv-007, 2011 U.S. Dist. LEXIS 20138, *9 (S.D. Ohio, March 1, 2011).  Under that section, Ohio law applies.

Applying the law of the Sixth Circuit to the facts at bar would lead to the application of § 148(1), rather than Subsection (2) as argued by InfoCision.  Subsection (1) states that "[w]hen the plaintiff has suffered pecuniary harm on account of his reliance on the defendant's false representations and when the plaintiff's action in reliance took place in the state where the false representations were made and received, the local law of this state determines the rights and liabilities of the parties unless, with respect to the particular issue, some other state has a more

11

significant relationship under the principles states in § 6 to the occurrence and the parties, in which event the local law of the other state will be applied."  "The state selected by application of the rule of Subsection (1) will usually be the state of dominant interest, since the two principal elements of the tort, namely, conduct and loss, occurred within its territory."  Comment d to Section 148.

Clearly, Ohio has the interests not only of compensating its citizens but also of regulating InfoCision such that choice of Ohio law is neither arbitrary nor fundamentally unfair.  See, e.g., *Chavez v. Blue Sky Natural Bev. Co.*, 268 F.R.D. 365, 379 (N.D. Calif. 2010); *Pevets v. Crain Communs., Inc.*, 2011-Ohio-2700, 2011 Ohio App. LEXIS 2302 (6th Dist., June 3, 2011), *cert. denied*, 130 Ohio St.3d 1417, 2011-Ohio-5605.

Turning then to Section 6 of the Second Restatement of the Law of Conflicts, these factors weigh in favor of the application of Ohio law to the nationwide class alleged herein.  The factors of Section 6 are as follows:  "(a) the needs of the interstate and international systems, (b) the relevant policies of the forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (f) certainty, predictability and uniformity of result, and (g) ease in the determination and application of law to be applied."  Ohio has a unique interest in regulating the conduct of these InfoCision whose primary place of business lies within its borders.  Moreover, InfoCision cannot argue that it is surprised or would suffer hardship resulting from the application of Ohio law to this matter.  Given the overriding interest in injunctive relief coupled with the relatively small amount of damages to be claimed by each putative class member, application of the various states' laws and denial of class certification would probably preclude recovery by any individual solicited by InfoCision in the manner alleged in Plaintiff's Amended Complaint.  Furthermore, the certainty,

predictability and uniformity of result together with the ease of determination and application of the law to be applied favor of the application of the law of Ohio, rather than of multiple states.

Assuming *arguendo* that the Court determines that Subsection (1) of § 148 of the Restatement of the Conflict of Laws does not apply, nevertheless, Subsection (2) also favors application of Ohio law to the exclusion of the other states in which potential class members reside or were contacted by InfoCision.  And even still assuming lack of Ohio's law to apply, InfoCision is further required to adhere to federal regulations that prohibit its conduct.

According to § 148(2), "When the plaintiff's action in reliance took place in whole or in part in a state other than that where the false representations were made, the forum will consider such of the following contacts, among others as may be present in the particular case in determining the state which, with respect to the particular issue, has the most significant relationship to the occurrence and the parties:

    (a)    the places, or places, where the plaintiff acted in reliance upon defendant's representations;

    (b)    the place where the plaintiff received the representations;

    (c)    the place where the defendant made the representations;

    (d)    the [domicile], residence, nationality, place of incorporation and place of business of the parties,

    (e)    the place where a tangible thing which is the subject of the transaction between the parties was situated at the time, and

    (f)    the place where the plaintiff is to render performance under a contract which he has been induced to enter by the false representations of the defendant.

Second Restatement of the Law of Conflicts, § 148(2).  While Subsection (f) may appear inapplicable, the Restatement cautions that such section includes instances in which the plaintiff's initial reliance consists of that individual's "entering into a contract, either with the defendant or with a third person, in which the plaintiff binds himself to take certain action."  Certainly, the initial evidence alluded to in Plaintiff's Amended Complaint could be construed as

creating contracts between those solicited and the charitable organizations based on continuing payments in exchange for feelings of goodwill and/or favorable tax benefits.

Plaintiff also asserts that there is a tangible component to these transactions.  InfoCision prides itself on its use of direct mail kits for fundraising and volunteer recruitment.  Am. Compl, ¶¶ 46-48 [Doc #: 44; PageID #: 426-27]; Answer, ¶ 25 [Doc #: 9; PageID #: 108].  Obviously, these direct mail kits are tangible and physically with InfoCision or its agents in Ohio at the time of the solicitation.  This argument, that kits were tangible, is consistent with comment c to Section 148 ("Sometimes, plaintiff's reliance will consist in receiving from the defendant *** some tangible thing".).

Plaintiff posits that two of the § 148(2) contacts – (c) and (e) – in addition to (a) and (b) with respect to the Named Plaintiff Dora Oatman plus InfoCision's domicile favor application of Ohio law to the putative class based primarily on Comment (j) to Section 148.  Comment (j), however, clearly states that "[n]o definite rules as to the selection of the applicable law can be stated, except in the situations covered by Subsection (1)."  Assuming then that Subsection (1) does not apply, nevertheless, the factors of Subsection (2) clearly favor application of Ohio law to the entire class as alleged.

Subsection (c) - the place where the defendant made the representations – favors application of Ohio law.  "The making of the representations provides a more important contact when the representations are made only in one state than when they are made in two or more." Second Restatement of Conflict of Laws, § 148, comment h.  "Where a major part of the representations is made in one state and a lesser part in another, the first state has a more important contact with the occurrence than does the latter." *Id.*  As demonstrated hereinabove, no state has a greater contact with the occurrence than Ohio, establishing predominance of law.

### b.  Predominance of Fact

Plaintiff offers the complete scripts for those supplied in part by InfoCision.  Exhibits 8-14.  As is apparent from the scripts, the InfoCision communicators are provided with specific answers to all anticipated questions.  These responses, also "cards", provide uniform responses closely monitored daily by each communicator's supervisor.  See Decl. of Zuccaro, ¶ 9; Decl. of Harrington, ¶ 5.  While these exhibits are stamped CONFIDENTIAL, each was filed in the public domain by InfoCision prior to commencement of any campaign and were filed in part by InfoCision in this litigation in the public domain.

One card that appears throughout the scripts provided to date in discovery (Plaintiff's Second Request for Documents was due this week but InfoCision has not yet produced any materials) is in response to the question, "Who are you?":

I'm calling from a WATS line in <COMMUNICATOR CITY/>,<COMMUNICATOR STATE>.  American Heart Association has found this to be the most cost-effective way to personally contact our supporters in all 50 states.  This way, more money will go back to the local affiliates.

**IF ASKED FOR NAME OF COMPANY**: I work for InfoCision.

**ONLY IF ASKED FOR INFOCISION'S CONTACT INFO**:
InfoCision Management Corporation
325 Springside Drive
Akron, OH  44333
330-668-1400
Contact: Steve Brubaker, Senior Vice President
Return to Point of Interruption

Exhibit 15.

A similar response to the question, "**WHY DOES YOUR NUMBER SHOW UP AS UNAVAILABLE?**, communicators are instructed to answer in the 2008 ADA CURE campaign,

Mr(s) _____, non-profit organizations are not required by law to display a (name/number).  At this time, we are testing various technologies in an effort to provide this service in a cost effective manner.

**RETURN TO POINT OF INTERRUPTION**

Exhibit 16.  This response, of course, implies that InfoCision, the entity actually placing the call, is the non-profit client.  In that calendar year, InfoCision and ADA reported that nationally, InfoCision received 73.12% respectively of the overall receipts for three campaigns as demonstrated in the financial reports filed in New York.  Exhibit 17.  The same script appears in the 2009 ADA CURE campaign.  Exhibit 18.  The **CALLER ID** card is also used by InfoCision in ACS scripts.  In 2008 Notes to Neighbors, the answer to **CARD 37: CALLER ID** is

> Mr(s) _____, I am calling for the American Cancer Society.  Non-profit organizations are not required to send Caller ID as this would add significant cost to our ability to reach our supporters across the country.  The reason we are calling today is ….
>
> ### RETURN TO POINT OF INTERRUPTION

Exhibit 7.  *None* of the scripts include any card to introduce the communicator as an paid solicitor for InfoCision during in-bound calls.

The same uniformity occurs with the Volunteer Recruitment ("VR") scripts.  For instance, Card 11 of the 2009 Dear Neighbor campaign for the AHA requires that in response to the **EXCUSE** (type face of the script), "**MY NEIGHBOR DOES IT EVERY YEAR FOR THE AMERICAN HEART ASSOCIATION**," the communicator must respond,

> Unfortunately, last year's volunteer for your neighborhood is not able to help us out in **<u>FEBRUARY</u>**.  That's why we urgently need your help to address just (<u>BLOCK SIZE</u>) **pre-printed** letters to your neighbors.
> I'm going to send your kit in late **<u>JANUARY</u>**, okay Mr(s) _____?
>
> |  |  |
> |---|---|
> | **IF YES**: | go to CARD 3A-B – Close for Yes |
> | **IF NO VOL/DONOR**: | go to CARD 6 – Direct Gift Ask |
> | **IF NO PROSPECT**: | go to CARD 4 – Close for NO |
> | **IF ADAMANT NO**: | go to CARD 4 – Close for NO |

Exhibit 15.  Communicators are required to make this statement regardless of its truth.  See Decl. of Zuccaro, ¶ 7.

With respect to the canned responses to questions by those solicited as to the amounts paid to InfoCision, InfoCision complains that its answers to these questions vary from campaign

16

to campaign.  This would be, simply because the InfoCision's contracts with non-profits are separately entered into with varying terms for each campaign.  These variations include the provision for insurance, complete indemnification or mutual indemnification, VR provisions, in-bound calling, and the length of the contract.  Within the contracts are the percentages for the non-profits in each state.  While these vary, they do not make such representations – or misrepresentations – incapable of categorization.  Although the answers vary from non-profit to non-profit and from year to year, InfoCision almost always provides two answers to this question of how much InfoCision will receive.  One is general and in large part thoroughly misleading, if not demonstrably false.  The more persistent callers ask how much from this specific phone campaign and there InfoCision provides some different, and sometimes accurate, responses.  Although InfoCision claims that "courts – including this one – routinely deny class certification in cases involving oral representations" [Doc #: 48; PageID #: 509], this is not true with respect to uniform scripts, which involve *the uniform conduct of the defendant*.

In support of its arguments regarding Fed.R.Civ.P. 23(b)(3) predominance, InfoCision cites *Faktor v. LifeStyle Lift*, U.S. Dist. No. 1:09-CV-511, 2010 U.S. Dist. LEXIS 3149 (N.D. Ohio, Jan. 15, 2009).  In that case, however, the representations were made in one-to-one consultations as well as in printed materials.  The representations made were unique to each patient.  Unlike the allegations here, "the inherently variable nature of these consultations is a strong factor precluding class certification." *Id.* at *16.  This Court  characterized its decision to deny certification in *Faktor* due to the "lack of commonality where representations about surgical procedures were not uniform across potential class, class members attended mandatory individual consultations prior to electing procedure, and class members had several procedure combinations from which to chose."  *Pfaff v. Whole Foods Market Group Inc.*, U.S. Dist. No. 1:09-cv-02954, 2010 U.S. Dist. LEXIS 104784, *10-11 (N.D. Ohio, Sept. 29, 2010).

In *Pfaff*, the Court certified a class pursuant to Fed.R.Civ.P. 23(b)(3) which involved claims for fraud, negligent misrepresentation and unjust enrichment, among others.  The Court noted that "even in affirming the denial of class certification in *Sprague*, the Sixth Circuit recognized that claims based on largely uniform representations to a discrete group could be certified in the appropriate case."  *Id.* at *11.  In *Pfaff*, "all class members purchased a case of products at an Ohio Whole Foods store, and Whole Food made the same or substantially similar representations to all class members regarding the 10% discount.  Common legal issues include whether Whole Foods' advertisements or representations were false or misleading and whether they were material ***."  *Id.*

In this case, the Class Members are those who in response donated their money and/or time based upon InfoCision's representations.  The InfoCision communicators used carefully scripted campaigns to make the same, or substantially similar, representations to all class members regarding the identity of InfoCision, and whether the communicator was calling on behalf of InfoCision in addition to the non-profit entity and, when asked, the relative percentage of the caller's funds being paid to InfoCision.  Moreover, even when InfoCision's compensation was not tied to contributions or amount of revenue from specific campaigns, the underlying contracts included  "assumptions upon which the estimate is based, which assumptions shall be based upon all of the relevant facts known to the professional solicitor regarding the solicitation to be conducted by the professional solicitor."  R.C. 1716.08(A)(2)(a).  "R.C. 1716.08(A)(2)(a) can be reasonably viewed as a complement to the fiduciary responsibilities of the charitable organization and the professional solicitor, by ensuring that the business decision is borne of reasonable analysis."  *Gold*, 2006-Ohio-943 at ¶ 141.

Plaintiff contends that each of these representations was intentionally or negligently misleading and was material to the transaction for time and money. Regarding predominance,

"the mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible." *Id.* at 16, quoting with approval *Powers v. Hamilton Cnty. Public Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007); *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988).

## 2.  Superiority – Fed.R.Civ.P. 23(b)(3)(B)

As noted by this Court, "Rule 23(b)(3) classes permit aggregation and litigation of many small claims that otherwise might not be brought because they lack economic viability." *Pfaff* at *18. "The 'most compelling rationale for finding superiority in a class action' is the existence of a 'negative value suit.' A negative value suit is one in which the costs of enforcement in an individual action would exceed the expected individual recovery." *Id.*, quoting *In re Inter-Op Hip Prosthesis Liab. Lit.*, 204 F.R.D. 330, 348 (N.D. Ohio 2001). Each of the factors enumerated in *Pfaff* applies herein – individual damages are small, lack of other pending litigation, desirability in the Northern District of Ohio, and manageability – all favor certification pursuant to Rule 23(b)(3). Confronted with a possible difference in the value to be refunded to those class members, the Court noted, "Sure, the discount to which any individual would have been entitled depends on the products they purchased, but is still only a mathematical calculation which, in all likelihood, could be performed by a computer spreadsheet program." *Pfaff* at *20.

Contrary to InfoCision's suggestion, the Amended Complaint does not allege a fail-safe class. A class is "fail-safe" if there is no way for the members of the class to lose – *i.e.*, where it only includes those who are "entitled to relief," allowing class member to either prevail or not be bound by a judgment. *Randleman v. Fid. Nat'l Title Ins. Co.*, 646 F.3d 347, 352 (6th Cir. 2011). If the defendant is not liable, because the class is defined in terms of the defendant's liability, there are no members of the class and only the named plaintiff is bound by the decision. *See*

19

*Genenbacher v. Century Tel Fiber Co. II, LLC*, 244 F.R.D. 485, 488 (C.D.Ill. 2007); *Campbell v. First Am. Title Ins. Co*., 269 F.R.D. 68, 73-74 (D.Me. 2010).

In *Randleman*, the alleged class was fail-safe because the definition required that each member be "entitled to relief."  Conversely, here the Class Members are those who received scripted calls, based on scripts containing misrepresentations, and who made donations of time or money.  The Class does not comprise *only those* with provable fraud claims entitling them to relief, as InfoCision suggests.  Here, InfoCision forcefully denies any liability and the issues for class-wide determination is whether the representations of InfoCision were intentionally or negligently misleading; whether that was actionable; and, whether InfoCision was unjustly enriched as a result. If this class is certified and the Court decides in favor of InfoCision, the class will be bound and indeed, if InfoCision truly believes that there is no actionable wrong, it should join the Plaintiff in seeking certification. See, *e.g.*, *Dale v. Daimler Chrysler Corp.* 204 S.W.2d 151, 179-80 (Mo. 2006).

## II.  CONCLUSION

This cause represents very important matters for those who seek only to give of themselves or of their monies *and* for those who have such great needs, which they cannot meet and who require such acts of generosity.  InfoCision's conduct significantly diminishes the ability of shared benefits between donor and donees.  Plaintiff respectfully moves for certification of the Class identified in the Amended Complaint pursuant to Fed.R.Civ.P. 23(b)(3) and/or in the alternative, pursuant to Fed.R.Civ.P. 23(b)(2), in conjunction with Rule 23(b)(3) or alone; for  appointment of Dora Oatman as Class Representative and Murray & Murray Co., L.P.A. and Elk & Elk Co., Ltd. as Class Counsel.

/s/ *Margaret M. Murray*_____
Dennis E. Murray, Sr. (0008783)
Margaret M. Murray (0066633)
Charles M. Murray (0052083)

Florence J. Murray (0080292)
Christopher W. Tackett (0087776)
MURRAY & MURRAY CO., L.P.A.
111 E. Shoreline Drive
Sandusky, Ohio  44870
Telephone:  (419) 624-3000
Facsimile:   (419) 624-0707
Email: dms@murrayandmurray.com
          mmm@murrayandmurray.com
          cmm@murrayandmurray.com
          fjm@murrayandmurray.com
          cwt@murrayandmurray.com

J.M. Kelley III (0061990)
John P. O'Neil (0067893)
Phillip A. Kuri (0061910)
ELK & ELK Co., Ltd.
6105 Parkland Blvd.
Mayfield Heights, Ohio 44124
Telephone:  (440) 442-6677
Facsimile:  (877) 355-1355
Email: jkelley@elkandelk.com
          joneil@elkandelk.com
          pkuri@elkandelk.com

Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

This is to certify that the foregoing document was filed electronically on August 5, 2013.

Notice of this filing will be sent by operation of the Court's electronic filing system to all parties

indicated on the electronic filing receipt.  Parties may access this filing through the Court's

electronic filing system.

/s/ *Margaret M. Murray*
Margaret M. Murray (0066633)
mmm@murrayandmurray.com
MURRAY & MURRAY CO., L.P.A.

Attorney for Plaintiff

## **LOCAL RULE 7.1**

This Memorandum in Opposition adheres to the page limitations for the Standard Track

set forth in Local Rule 7.1 of the United States District Court for the Northern District of Ohio as

modified by order of the Court on July 22, 2013.

_/s/ *Margaret M. Murray*
Margaret M. Murray (0066633)
MURRAY & MURRAY CO., L.P.A.

Attorney for Plaintiff